UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN WELCH, ET AL.,

                Plaintiffs,

v.

MICHAEL BROWN, ET AL.,

                Defendants.

_____/

Case No.  12-13808

SENIOR UNITED STATES DISTRICT JUDGE
ARTHUR J. TARNOW

MAGISTRATE JUDGE MONA K. MAJZOUB

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION [2]

Before the Court is Plaintiffs' Motion for a Preliminary Injunction, filed on August 29, 2012 [2]. For the reasons stated below, Plaintiffs' Motion is GRANTED.

### I. Procedural Background

Plaintiffs originally filed their Complaint [1] on August 28, 2012. Their Motion for a Temporary Restraining Order [2] was filed on August 29, 2012. Defendants were served the same day. Plaintiffs sought to prevent proposed changes to retiree health-care plans from going into effect on September 1, 2012. Defendants filed a Response [10] on August 31, 2012. On September 6, 2012, after a conference, the parties indicated that they required additional time to take depositions, and that they would submit supplemental briefs to the Court after said discovery. The parties submitted a written stipulation to the Court that they had "agreed to submit transcripts of the depositions and documentary evidence and summaries supporting their respective positions . . . in lieu of an evidentiary hearing before the court." Plaintiffs filed their supplemental brief on November 30, 2012. Defendants filed their supplemental brief on December 6, 2012. As the parties have submitted evidence in support of and in opposition to

the motion, and have had sufficient time to brief the issues, the Court will treat the motion as a motion for a preliminary injunction.

## II. Factual Background

This case involves the alteration of lifetime health insurance benefits of retired municipal workers in the City of Flint. Plaintiffs allege that through a number of collective-bargaining agreements ("CBAs") they were promised lifetime health benefits identical or comparable to the plans in place when they retired. Compl. ¶ 20; Pls.' Supplemental Br., Ex. A., Dep. of Kenneth Sparks ("Sparks Dep.") at 6; Pls.' Supplemental Br., Ex. D., Dep. of John Welch ("Welch.") at 6. Some of the proposed Plaintiffs[1] were exempt from collective bargaining but were allegedly granted lifetime health benefits by Flint's municipal ordinances. Compl. ¶ 20. Plaintiffs allege that their health will be negatively affected by the alterations to their insurance enacted by the Emergency Manager.

Defendant Michael Brown was appointed as Emergency Manager for Flint according to Public Act 4, Mich. Comp. L. § 141.1519(k).[2] Public Act 4 was repealed by Michigan voters on November 6, 2012. At the time this case was filed, Public Act 4 purportedly permitted Brown to modify or terminate existing contracts and CBAs. Plaintiffs allege that in April, 2012, Brown issued several orders that unilaterally modified the terms of their CBAs. The modifications do several things. First, the modifications require individuals who are eligible for Medicare to sign up and pay for Medicare A and B. Pls.' Supplemental Br., Ex. G., Deposition

---

[1]Plaintiffs have indicated in their complaint that they will seek to certify a class; however, class certification is not yet before the Court.

[2]After the repeal of Public Act 4, Defendant Brown was appointed by the new Emergency Manager, Edward Kurtz, as the City Administrator of Flint. Ambrose Dep. at 25-26.

of Robert Erlenbeck ("Erlenbeck Dep.") at 16.  Retirees would be required to pay an additional $100 per person per month because of this change.  Sparks Dep. At 12.  The Medicare changes are scheduled to go into effect July 1, 2013.  Erlenbeck Dep. at 16.  The modifications also shifts costs from the City of Flint to retirees by increasing the deductible from $50 ($100 per family) to $1000, and increasing the co-pay maximum from $1000 to $2,500.  *Id.* at 20.  Defendants estimate that shifting insurance costs to Plaintiffs will save the City of Flint $3.5 million a year. *Id.* at 23-24.

The modifications were adopted as part of an ongoing series of orders of the Emergency Manager.  According to a "Financial and Operating Plan" prepared by the Emergency Manager, the City of Flint, because of conditions that developed "over a period of decades," is in financial distress.  Defs.' Supp. Br., Ex. A, City of Flint Financial and Operation Plan, at 2.  Since 2001 Flint has slashed its workforce by 50%.  Since 2006, income tax and property tax revenues have fallen.  *Id.* at 3; Ambrose Dep. at 6-7.  In addition, the State of Michigan has made a "significant reduction" in revenue sharing.  Ambrose Dep. at 7.  Because of these changes, Flint has operated under cumulative deficits "over several years."  *Id.* at 1.  The Emergency Manager states that the "cumulative deficit" of Flint is $25.7 million.  *Id.*  The general fund deficit grew from $7,046,820 in June 30, 2008 to $14,621,546 as of June 30, 2010.  *Id.*  This apparently fell to $8.9 million on June 30, 2011, although the Emergency Manager's report attributes this fall in the deficit entirely to the issuance of municipal bonds as a source of short-term revenue.  *Id.* at 2. The general fund deficit was $11 million in January of 2012, with a "structural operating deficit" (i.e., amount spent greater than amount received through revenue) of $6,768,864 as of June 30, 2011.  *Id.* at 1-2.  Structural operating deficits in the general fund have existed since at least

2007. *Id.* at 2. The Emergency Manager rejected a plan submitted by Flint that sought to eliminate the deficit by 2030 and that included an additional $12 million in bonds in 2013. *Id.* at 2.

In Fiscal Year 13 ("FY13") income tax revenues "appear to have stabilized, and even increase[d]," while property tax revenues continue to decrease. *Id.* at 7.

The Emergency Manager established several goals for the city, which included: (1) long-term financial stability, (2) an increase in revenue base, (3) a reduction in government costs through negotiated union contracts, consolidation and share services, and "ongoing professional development of staff," (4) modernization of the city infrastructure, (5) streamlining of procedures to allow businesses to locate and operate in the city, (6) the implementation of a plan to "stabilize and then increase the commercial and residential base of the city," and (7) to provide public safety services, focusing on reducing violent crime. *Id.* at 3.

Beginning in December 2011, the Emergency Manager terminated a number of city administrators, eliminated the salary and benefits of the mayor and city council (later restored to 60% salary and full benefits for the mayor and 30% salary and no benefits for city council members), and eliminated Flint's Office of the Ombudsman and Civil Service Commission. Flint's prescription drug plan was modified to require the use of generic drugs.[3] *Id.* at 4-5. The Emergency Manager's report then provided a laundry list of potential options to reduce spending and/or to increase revenue. *Id.* at 9-11.

---

[3]This modification, which is not before this Court, is currently enjoined as a violation of the state's contract clause, as a previous settlement agreement had required Flint to maintain its "current" prescription drug plan. *See Yurk v. City of Flint*, No. 01-71149-NZ (Genesee Cty. Cir. Ct., Dec. 11, 2012).

In FY2013, the Emergency Manager proposed a "balanced budget." The balanced budget sought to eliminate Flint's $25.7 million deficit in a single year. Therefore, the budget required that the Emergency Manager immediately reduce city spending by $25.7 million. Ambrose Dep. at 10-11. The Emergency Manager eliminated the positions of 115 city employees, implemented a 20% salary reduction of the remaining employees, and made cuts to health-care benefits, resulting in approximately $20 million to be put toward deficit reduction. The cuts made to the retiree health-care benefits at issue in the instant case amount to $3.5 million of this $20 million sum. In addition, the city increased fees for water and sewage to raise $15 million, garbage fees to raise $1.5 million, and street light assessments to raise $2.85 million. Ambrose Dep. at 11-13. The Public Safety Department had no reduction in personnel. *Id.* at 13.

In the opinion of Gerald Ambrose, the Financial Advisor to Defendant Brown, if the Emergency Manager had not been able to cut retiree benefits, "[i]t would be essential for us to reduce our expenditures immediately by $3.5 million dollars." *Id.* at 13. Ambrose stated he would not recommend additional revenue to make up the $3.5 million because "[t]here are no revenue sources." *Id.* at 14. Ambrose opined that he would "have to make reductions in all city services including police and fire," because those departments consume 70% of the city's remaining general fund. *Id.*

### III. Analysis

### Legal Standard

To determine whether to grant injunctive relief, this Court considers:

(1) whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) whether the movant has shown that he or she would suffer irreparable harm if the preliminary relief is not issued; (3) whether the

issuance of a preliminary injunction will not cause substantial harm to third parties; and (4) whether the public interest would be served by the issuance of a preliminary injunction.

*Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995).

The standard is not a rigid one, and the four factors are balanced against each other. *In re Eagle-Picher Indus., Inc.*, 963 F.3d 855, 859 (6th Cir. 1992). The four factors apply to a temporary restraining order. *N.E. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981). Nevertheless, a preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power." *Leary v. Daeschner*, 228 F.3d 729, 730 (6th Cir. 2000).

### A. Probability of Success on the Merits

In demonstrating a probability of success on the merits, "a party 'is not required to prove his case in full . . . .'" *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Camenisch*, 451 U.S. at 395). Rather, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). However, "in

order to establish success on the merits of a claim, a plaintiff must show more than a mere

possibility of success." *Six Clinics Holding Corp.*, 119 F.3d at 402 (citing *Mason County Med.*

*Ass'n v. Knebel,* 563 F.2d 256, 261 n. 4 (6th Cir.1977)).

### Count I - Contracts Clause

Plaintiffs argue that Defendant Brown's order modifying retiree health-care benefits,

agreed to through collective bargaining, violates the Contracts Clause, art. I. Sect. 10 of the

United States Constitution, which states that "No State shall . . . pass any . . . law impairing the

Obligation of Contracts."  Plaintiffs bring an action pursuant to 42 U.S.C. § 1983.  The Court

notes that only those Plaintiffs who derive their health-care benefits from CBAs, as opposed to

city ordinance, may properly bring an action for violation of the Contracts Clause.  Plaintiffs do

not argue, and the Court is not aware, of any case law that would support a Contracts Clause

claim based on statutorily-conferred health care benefits.

The Supreme Court has recognized the "high value" the Framers placed "on the

protection of private contracts." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245

(1978).  Accordingly, "private contracts are not subject to unlimited modification under the

police power."  *Id.* at 244 n.15.  However, not all impairments of contract run afoul of the

Constitution.  Rather, a court must look to determine whether a particular law "operated as a

substantial impairment of a contractual relationship." *Energy Reserves Grp. v. Kansas Power*

*& Light*, 459 U.S. 400, 411 (1983) (quoting *Spannaus*, 438 U.S. at 244).  A substantial

impairment to a contract may exist "even where there has not been a 'total destruction of

contractual expectations.'" *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 326-28 (6th

Cir. 1998) (quoting *Energy Reserves Grp., Inc.*, 459 U.S. at 411).  "If a substantial impairment

exists, the 'severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected.'" *Id.* Accordingly, "[t]he conflicting values of protecting the right of individuals to order their affairs by contract and allowing the states to exercise 'essential attributes of sovereign power which are necessarily reserved by the states to safeguard their citizens' are both recognized in the analytic framework used to assess Contracts Clause claims." *Toledo Area AFL-CIO Council*, 154 F.3d at 323 (quoting *Linton v. Comm'r of Health and Env't*, 65 F.3d 508, 517 (6th Cir. 1995)).

If a court determines that a substantial impairment exists, the burden shifts to the state to provide a "significant and legitimate" public purpose for the regulation. *Id.* If the state proffers such an explanation, the court must determine whether "the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Toledo Area AFL-CIO Council*, 154 F.3d at 323 (quoting *Energy Reserves Grp., Inc.*, 459 U.S. at 412) (alterations in original). When an impaired contract is between private parties, a court will normally defer to the state's judgment. However, where a state's self-interest is implicated in an abrogated contract, a court "will look to see whether the state's self-interest makes [the defense of necessity and reasonableness] inappropriate." *Id.*

> In applying this standard . . . complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.

*U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25-26 (1977).

As such, an impairment of a contract is not "necessary" if "a less drastic modification would have permitted" the contract to remain in place. *Id.* at 29-30. "[A] State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purpose equally well." *Id.* at 30-31. Finally, "a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors." *Id.* at 29.

**Substantial Impairment**

The Court finds that the modifications imposed by Defendant Brown operate as a "substantial impairment" on the existing contracts that exist between those retirees who were provided lifetime health care benefits through CBAs. While Defendants insist that the changes are minor and may be temporary, the Court finds that the large increases in deductibles and co-payment maximums combined with the additional out-of-pocket expenses required by Medicare Part B act as a "significant impairment" on the provisions of the CBAs at issue, which provide lifetime health-care benefits with much lower out-of-pocked costs. Plaintiffs have testified that they live on fixed incomes and that increased health care costs would put a "severe strain" on their ability to pay monthly expenses, and could result in them being unable to afford to stay in their homes. Kenneth Sparks Dep. at 12-13. Plaintiff John Welch testified that he would have to spend money out of his savings to meet his medical costs because of the modifications imposed by Defendant Brown. John Welch Dep. at 16-17.

**Significant and Legitimate Public Purpose**

The Court must next ask whether the state has proffered a "significant and legitimate" public purpose for the regulation, and, if so, "the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Id.*

Defendants argue that the "significant and legitimate" public purpose of the Emergency Manager's reduction of retiree health-care benefits is to "protect the citizens of the City." Defs.' Resp. at 8. Defendants argue that the City of Flint is extremely dangerous, and that if this Court enjoins the Emergency Manager's actions "the City will be forced to cut over three million dollars from its Public Safety Budget."

Defendants' argument is somewhat speculative, as it focuses on what result might occur if this Court were to enjoin Defendants' action. Obviously, however, an action that Defendants *might* take as a *result* of a lawsuit and subsequent court action cannot be the public purpose motivating the pre-lawsuit actions of the Emergency Manager. It is the public purpose behind Defendants' actions that the Court looks to determine a violation of the Contracts Clause, not speculative results of what might happen were the Court to act. Defendants' argument that the Emergency Manager was required to cut retiree health-care benefits to protect public safety can only be understood as part of the Emergency Manager's large goal of balancing the city's budget; as discussed below, it is this purpose that motivated the cuts in the first place.

The Court has looked elsewhere in Defendants' briefs for a "legitimate public purpose." Defendants' supplemental brief contains a single line stating that the Emergency Manager was required to make "necessary changes" so that the city could avoid bankruptcy. Defs.'

Supplemental Br. at 1.  However, there is no evidence in the record indicating that the city considered or was being forced into entering bankruptcy.  Indeed, according to the evidence presented in the Emergency Manager's report, the city had been operating at a deficit since at least 2007 and had not entered bankruptcy.  According to the same evidence, the city's general fund deficit shrank from $14 million in 2010 to approximately $11 million in 2012.

Another possible "legitimate public purpose" is articulated in the testimony of Defendant Gerald Ambrose, the Financial Advisor to Defendant Michael Brown during his tenure as Emergency Manager.  Under the now-repealed Public Act 4, the State determined that Flint was in a financial emergency.  Defendant Brown, once appointed, set about reducing expenditures and raising revenue for the purpose of achieving a balanced budget in Fiscal Year 2013 ("FY 2013").  His actions were constrained by the state's unwillingness to permit additional bonds as well as the state's pledge to further reduce revenue-sharing with Flint were the Emergency Manager to abrogate contracts with existing bondholders.  Ambrose Dep. at 27-29, 55-56.  Plans to raise revenue through a millage were approved for the Public Safety Department but were not considered for the payment of contractual retiree health-care benefits because the Emergency Manager felt priority should be given to public safety  *Id.* at 66.  Accordingly, in order to meet the goal of a balanced budget in FY 2013, Defendant Brown sought to cut as many city expenses as possible without making cuts to the fire and police departments.

Defendants have offered two potential legitimate public purposes for the impairments made to Plaintiffs' contracts: (1) to prevent bankruptcy, and (2) to achieve a balanced budget to "resolve the financial emergency."  Defs.' Ex. 1 at 1.  As a part of the latter purpose, Defendants sought to avoid cuts to the police and fire departments.

**Abrogation of Contracts Reasonable and Appropriate**

This Court must next consider whether "the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *Toledo Area AFL-CIO Council*, 154 F.3d at 323 (quoting *Linton v. Comm'r of Health and Env't*, 65 F.3d at 517). Because the state has a contractual obligation to pay retiree health care benefits, and the state seeks to reduce that obligation through abrogation of the contracts at issue, this Court must "look to see whether the state's self-interest makes [the defense of necessity and reasonableness] inappropriate." *Id.* Because the state's self-interest is at stake, the Court is also mindful that "complete deference to a legislative assessment of reasonableness and necessity is not appropriate . . . ."

In *Toledo Area AFL-CIO* the Sixth Circuit held that a state law was not sufficiently reasonable or necessary to achieve its stated goal. *Toledo Area AFL-CIO* concerned an Ohio law banning public employers from providing union check-offs on the wage statements of members of public-employee unions. The Sixth Circuit found that the law explicitly violated a provision of the CBAs that required that public employers provide a wage check-off option. While Ohio argued that the law was necessary to prevent coercion, prevent public corruption, and avoid the politicization of state employees. The Sixth Circuit found that while the state's purposes might have been legitimate ones, the state's action in abrogating contractually agreed-upon rights was not reasonable or necessary to achieve those legitimate purposes because the state had self-interested reasons in wishing to mute the political power of public employee unions. The court was also concerned by the total lack of evidence provided by the state in support of its asserted public purposes. *Toledo Area AFL-CIO*, 154 F.3d at 325-26.

Here, the Court finds that Plaintiffs have "raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). The Emergency Manager has ordered the reduction of contractually-agreed-upon lifetime health-care benefits to retirees for the stated purpose of avoiding municipal bankruptcy and achieving a balanced budget in FY 2013. The Court finds that the proposed reduction in contractual benefits is not "reasonably necessary and appropriate" to meet the public purposes of avoiding bankruptcy and balancing the city budget.

Defendants have failed to provide evidence that Defendant City of Flint was at imminent risk of bankruptcy. As established by Defendants' own evidence, the City of Flint has been operating with a general fund deficit since at least 2007. In addition, the general fund's operating deficit has actually shrunk since 2010. Similarly, Defendants provide no argument or evidence regarding the underlying necessity of achieving a balanced budget in Fiscal Year 2013. Defendants' aver that "[t]he City is required to adopt a balance [sic] budget for FY13 as part of its deficit elimination plan . . . ." However, Defendants fail to explain why the Emergency Manager chose to eliminate the $25.7 million budget deficit in a single year when "a less drastic modification" might have permitted the contracts between the city and the retirees at issue in this case to remain in place. *United States Trust Co. of New York*, 431 U.S. at 29-30. "[A] State is not free to impose a drastic impairment when an evident and more moderate course would serve its purpose equally well." *Id.* at 30-31. Defendants have made no effort to explain why balancing the budget in a single year is sufficiently necessary such that they should be permitted

to violate contract rights.  While the Court is sympathetic to the burdens placed on the Emergency Manager and the City of Flint by their decision to balance their budget, Defendants cannot simply foreclose other options, such as an additional millage or increased sewer and water fees, as suggested by Plaintiffs, and use said foreclosure as a reason to abrogate duly-bargained-for contracts.

Accordingly, the Court finds that Plaintiffs have satisfied the likelihood of success on the merits prong of their motion for a preliminary injunction with respect to their Contracts Clause claim.

**Defendants' Argument - No Lifetime Benefits in CBAs**

Defendants argue that there are no lifetime health-care benefits promised in this case because the CBAs at issue "have express duration clauses."  Defendants argue that when a CBA expires, so too do the healthcare benefits promised by a CBA, citing *Harps v. TRW Auto. U.S., LLC*, 351 F. App'x 52 (6th Cir. 2009) for this proposition.  However,  Defendants argument is only true insofar as the language of a CBA indicates that certain rights are temporally limited. In *Harps* the Sixth Circuit found that the retirees had waived their right to challenge the question of whether their CBA was ambiguous on the duration of their healthcare benefits, and also found that the CBA had clearly established that their healthcare benefits were *not* intended to be lifetime benefits.

Defendants have presented no evidence to the Court that the CBAs at issue have express duration clauses. Defendants merely assert that this is the case. Defendants' argument is therefore unpersuasive.

**Defendants' Argument - Contracts Clause Applies Only to Legislative Body, Not Individual Officials**

Defendants next argue, based on an unpublished case from the Third Circuit, that Contracts Clause claims "must rest on an exercise of legislative power, not the acts of administrative or executive boards or officers." *Perano v. Twp. of Tilden*, 423 F. App'x 234, 239 (3d Cir. 2011). As the court in *Perano* clarified, however, the Contracts Clause is not implicated in the "acts of administrative or executive boards or officers" where the officers "did not change any laws; [they] merely enforced them in a way that allegedly impaired [the plaintiff's] rights . . . ." *Id.*

Here, however, the actions of the Emergency Manager are not simply the enforcement of already-existing laws. Rather, by powers delegated to him by the legislature through Public Act 4, the Emergency Manager was empowered to unilaterally modify already-existing contracts, to fire elected municipal officials, and to repeal and put into place new municipal ordinances. These actions appear to be exactly the sort of "exercise of legislative power" that *Perano* recognizes as running afoul of the Contracts Clause. As such, Defendants' argument is unpersuasive.

**Defendants' Argument - Plaintiffs Have Not Shown That They Were Denied Opportunity to Seek Remedy in State Court**

Defendants next argue, based on a Fourth Circuit case, that "§ 1983 actions are limited to the discrete instances where a state has denied a citizen the opportunity to seek adjudication through the courts as to whether a constitutional impairment of a contract has occurred." *Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011). Defendants argue that Plaintiffs "have neither alleged that the state has denied them an opportunity to seek recourse through the courts,

nor alleged that the state foreclosed the imposition of an adequate remedy for an established impairment."

*Crosby* is an unusual case that bases its reading of 42 U.S.C. § 1983 and the Contracts Clause on a passage from a 1885 Supreme Court case, *Carter v. Greenhow*, 114 U.S. 317 (1885). Both the Fourth Circuit and the district court decision below, 682 F. Supp. 2d 537 (W.D. N.C. 2010), however, are primarily concerned with parsing whether a state has simply breached a particular contract, in which case the proper remedy is a state breach-of-contract claim, or whether the state has impaired a contract in violation of the Constitution.

In the instant case, Plaintiffs do not allege that Defendants have simply breached their contract by, for instance, refusing to pay monetary benefits as required by contract. Rather, Plaintiffs allege that Defendants have unilaterally altered the language of the contract through state action, namely, the order of Defendant Brown. Because the terms of the contracts have been altered by Defendant Brown, Plaintiffs are foreclosed from bringing a breach of contract claim. The instant case is thus precisely the sort of case in which a claim for impairment of contract is appropriate.

Finally, as recognized by the Ninth Circuit in *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003), the Fourth Circuit's holding is seemingly contradicted by *Dennis v. Higgins*, 498 U.S. 439, 451 n.9 (1991), in which the Court held that it had already given *Carter* a "narrow reading" as the *Carter* court had "held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract [and] was not to redress deprivation of the right secured to him by [the Contracts Clause]." Accordingly, the Court does not find Defendants' argument persuasive.

## Count II - Violation of Bankruptcy Clause

Plaintiffs next allege, pursuant to 11 U.S.C. § 903(1), that the orders of the Emergency Manager run afoul of the Bankruptcy Clause of the United States Constitution, art. I, Sect. 8, which states that Congress may enact "uniform Laws on the subject of Bankruptcies throughout the United States." Pursuant to 11 U.S.C. § 903(1), state laws or the application of state laws intended to reduce municipal debt obligations to non-consenting creditors are preempted. Plaintiffs allege that as retirees they are "creditors" with an interest in municipal debt, and that the order of the Emergency Manager modifying their healthcare benefits is a means of "reducing municipal debt obligations," and is a form of bankruptcy.

This is the weakest of Plaintiffs' arguments. Defendants are correct in arguing that the City of Flint is not in bankruptcy and is not restrained by the Bankruptcy Clause or 11 U.S.C. § 903(1). Therefore, the Court finds that Plaintiffs are unlikely to prevail on the merits of their Bankruptcy Clause claim.

## Count III - Violation of Due Process under Fourteenth Amendment

Pursuant to 42 U.S.C. § 1983, Plaintiffs allege that they were denied their Fourteenth Amendment rights to both procedural and substantive due process, and that their property was taken without just compensation. "Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 (1977). As such, Plaintiffs argue that abrogation of their contractual health-care benefits constitutes a violation of their right to due process. Plaintiffs further argue that those Plaintiffs who were guaranteed lifetime health-care benefits pursuant to city ordinances have also been denied due process. To assert a property interest, a party must point

to "some policy, law, or mutually explicit understanding that both confers the benefit and limits the discretion of the City to rescind the benefit." *Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 410 (6th Cir. 2002). "A state-created entitlement that cannot properly be eliminated except for cause is a property right of which the holder may not be deprived without procedural due process." *Goodman v. City of Detroit*, 106 F.3d 400 (6th Cir. 1997) (unpublished) (quoting *RR Village Ass'n, Inc. v. Denver Sewer Corp.,* 826 F.2d 1197, 1201 (2d Cir.1987)).

Defendants argue in response that this claim is "not ripe," because the retirees "ha[ve] not sought compensation through procedures established by the state." *Williamson Cty. Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 190-194 (1985). In *Williamson County* the Supreme Court concluded that a jury verdict awarding damages based on the application of a zoning ordinance to property owned by a bank was inappropriate because the property owners had "not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation." The Supreme Court noted that before a requirement to follow state procedure was found, a state was required to demonstrate that "reasonable, certain and adequate provisions for obtaining compensation" existed at the time of the taking. Defendants also note that Michigan provides that property owners whose property is "damaged rather than taken by governmental action" may bring an "inverse condemnation" suit to obtain damages. *Matter of Virginia Park*, 328 N.W.2d 602, 604 (Mich. App. 1982).

The Court is not persuaded that "reasonable, certain and adequate provisions" exist that would permit Plaintiffs to receive compensation for the reduction of their health care benefits. The "inverse condemnation" references by both federal and state courts refer to the taking of

physical property, and case law discusses how to establish damage from, for instance, the loss of tenants due to government action or physical damage to a piece of property.  The Court is not persuaded that Plaintiffs must institute an "inverse condemnation" in state court as a means of obtaining "just compensation" for the taking of their health care benefits prior to instituting an action in federal court.  Defendants provide no case law to support the contention that an inverse condemnation action is applicable to a case in which the state is accused of stripping a person not of the value of their physical property, but rather a state-sponsored health care plan.

Accordingly, the Court finds that Plaintiffs have established a likelihood of success on the merits of their due process claim.

## Conclusion - Likelihood of Success on the Merits

For the reasons stated above, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits as to their Contract Clause and Due Process claims with respect to those Plaintiffs who derive their health-care benefits from CBAs.  The Court finds that Plaintiffs have demonstrated a likelihood of success on the merits as to their Due Process claim with respect to those Plaintiffs who derive their health care benefits from city ordinance.

## B. Irreparable Harm

Plaintiffs argue that they will suffer irreparable harm because of the deprivation of their constitutional rights and because of their potential loss of access to health-insurance benefits. While Plaintiffs do not allege that they will completely lose access to health insurance, they do specifically state that increased health-insurance costs will require Plaintiffs to choose between the cost of health care, the cost of basic living necessities, and the payment of their mortgage.

For instance, in an affidavit, Plaintiff Carolyn Sparks, who is the spouse of  retired City

of Flint police officer Kenneth Sparks, alleges that she will be forced by the proposed changes to either forego necessary medical care or forego basic necessities. *See* Pls.' Mot., Ex. B. Plaintiffs thus rest their argument for "irreparable harm" on this concept - that money damages are not sufficient to cure changes to retiree health care benefits that will result in Plaintiffs losing access to necessary medical care.

Defendants argue in response that Plaintiffs have an adequate remedy in money damages. Defendants argue that Plaintiffs must show an "actual and imminent" non-compensable injury for which legal damages are inadequate. *Fox v. Massey Ferguson, Inc.*, 172 F.R.D. 653, 680 (E.D. Mich. 1995), *aff'd*, 91 F.3d 143 (6th Cir. 1996). Here, Defendants argue, "Plaintiffs are simply alleging that their health care costs will marginally increase," and that Plaintiffs can "recover money damages to make them whole."

Plaintiffs are correct that, under certain circumstances, the loss or impairment of health insurance is sufficient to find irreparable harm. For instance, the Michigan Supreme Court has held that "[i]n certain circumstances, for instance, the loss of health insurance benefits where there is a serious immediate or ongoing need for medical treatment" may be sufficient to support a finding of irreparable injury sufficient to support preliminary injunction. *State Emps. Ass'n v. Dep't of Mental Health*, 365 N.W.2d 93, 101 n.10 (Mich. 1984). In *Intn'l Res., Inc. v. N.Y. Life Ins. Co.*, 950 F.2d 294, 302 (6th Cir. 1991), the Sixth Circuit upheld a district court's finding that a loss of health insurance, which would "adversely effect the proper maintenance of [the plaintiff's] health," as well as the fact that "interruption of the care might cause irreversible physical harm," was sufficient to establish irreparable harm.

In a similar case involving a challenge to modification of retiree health benefits, a court in this district found that retirees who alleged a choice between needed medical procedures and the payment of basic necessities had sufficiently alleged irreparable harm to establish their right to a preliminary injunction. *Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410, 415 (E.D. Mich. 1994) (Gadola, J.) (citing *United Steelworkers of Amer. v. Textron, Inc.*, 836 F.2d 6 (1st Cir. 1987) (finding that retirees as a group have less resources and are more vulnerable to imposition of additional insurance costs)).

Here, Plaintiffs provide evidence that they may have to forego medically necessary treatment or forego basic necessities as a result of Defendants' actions. Plaintiffs Carolyn and Kenneth Sparks and Jack and Judie Welch all state that they will have to forego medical treatment or medication because of increased insurance costs.

As Plaintiffs have demonstrated that their access to necessary health care may be threatened by Defendants' modification of their health care benefits, and as Plaintiffs have further demonstrated that Defendants' actions may violate their constitutional rights, the Court finds that Plaintiffs have established that they will suffer irreparable harm absent the grant of a preliminary injunction.

### C. Whether Preliminary Injunction Will Cause Harm to Third Parties and is in the Public Interest

Plaintiffs argue that their proposed relief, the restoration of their contractual or statutory health care benefits, is in the public interest in that it ensures that a significant number of retired public employees will not suffer serious harm due to lack of medical care. Plaintiffs also argue that any financial harm that Defendants can point to is "insubstantial" when compared to the

possible harm to Plaintiffs.  Plaintiffs note that if a preliminary injunction is granted and Plaintiffs later do not prevail, Defendants could precisely determine the costs of providing insurance to Plaintiffs and recoup those expenses.

Defendants argue that the issuance of an injunction would cause substantial harm to other residents of Flint because if the retiree's healthcare costs are not cut, "the cost of healthcare will increase by $3.5 million for [Fiscal Year 2013]. There is no additional revenue available." Defendants argue that any "increases in budget expenses will result in a corresponding reduction in the budget of public safety."  This is because, according to the declaration of the new Emergency  Manager of Flint, Edward J. Kurtz, "the City will be forced to reduce the Public Safety budget by the corresponding amount since all other departments have already received significant reductions in the FY13 budget."  Defs.' Resp. to Mot., Ex. 3.  According to Defendants, said cuts would endanger the citizens of Flint.

Plaintiffs are correct that the additional costs of their health insurance are easily quantifiable for the duration of an injunction.  Accordingly, were Defendants to prevail on the merits, any additional costs to the city can be repaid by Plaintiffs.  Further, and as discussed extensively above, *supra* p. 12-16, the Court is unconvinced that Defendants will be "forced" to make cuts that will negatively affect the public safety of the citizens of Flint, as Defendants have presented no evidence as to why their self-imposed target of a balanced budget in Fiscal Year 2013 is sufficiently "reasonable and necessary" as to require the abrogation of contract rights.

Accordingly, the Court finds that issuance of a preliminary injunction will not cause harm to third parties.  Further, the public interest weighs in favor of ensuring continuing health care to members of the public.

## IV. Conclusion

For the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for a Preliminary Injunction [2] is **GRANTED**.  Defendants are hereby enjoined from  modifying the contracts and/or ordinances governing Plaintiffs' health-care benefits, and to the extent that modification has already occurred, the contracts and ordinances are restored to the status quo ante.

**SO ORDERED**.

<u>s/Arthur J. Tarnow</u>
ARTHUR J. TARNOW
SENIOR UNITED STATES DISTRICT JUDGE

Dated: March 29, 2013